IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CORPORATE HEALTHCARE FINANCING, INC., et al. | : : : | |
| v. | : : | CIVIL NO. CCB-05-3391 |
| BCI HOLDINGS CO., et al. | : | |

...o0o...

**MEMORANDUM**

  The plaintiffs, Performax, Inc. ("Performax") and Corporate Healthcare Financing, Inc. ("CHF"), filed this suit against defendants BCI Holdings Co. and Brokerage Concepts, Inc. (collectively, "BCI") on December 19, 2005. The plaintiffs allege that BCI has violated, and will continue to violate, a restrictive covenant in a 1999 contract between BCI and CHF, for which they seek injunctive, declaratory, and monetary relief. On December 30, 2005, the plaintiffs filed a motion for a preliminary injunction against BCI. After the parties submitted briefs, the court held an evidentiary hearing on February 21 and March 3, 2006, but did not rule on the motion. On June 16, 2006, the plaintiffs filed a motion for a temporary restraining order ("TRO") or, in the alternative, a renewed motion for a preliminary injunction. On June 29, 2006, the court issued a TRO that prospectively barred BCI from soliciting or accepting business from CHF or Performax clients with whom it has had a client service relationship. Based on the following, the court will issue a preliminary injunction that will essentially extend the TRO for the pendency of this litigation.

I. Background

1

CHF is a Michigan corporation based in Maryland that provides various services to employers that self-insure their employee health insurance plans. BCI is a Pennsylvania company that, *inter alia*, serves as a third-party administrator ("TPA") for such self-insured health plans.[1] The two entities began working together in the early 1990s and, after proceeding on the basis of oral agreements for several years, they reduced their arrangement to writing in August 1999 through an Administrative Services Agreement ("ASA"). (Compl., Ex. A.) The ASA, which was signed and executed by Arnold Katz, President of BCI, and Keith Sullivan, President of CHF, was intended to run until September 2005. Under the ASA, CHF would provide its clients[2] with certain auxiliary services – such as plan design, cost containment, and selecting a stop-loss insurance policy – and would refer clients to BCI to serve as their TPA. BCI would contract directly with the clients, and also would perform the eligibility functions, i.e. determining which employees and dependents were eligible for coverage. The ASA contained a restrictive covenant, which provided in relevant part:

> BCI and CHF covenant and agree that during the term of this Agreement and for a period of three (3) years after the termination of this Agreement, neither party shall directly or indirectly solicit or accept, without the other party's written approval (which approval may be granted or withheld in the other party's sole and absolute discretion) for its own account or for the account of others, orders for third-party administration, utilization management, network access, or other similar services from any customers of the other during the term of this Agreement, or customers of the other's affiliated businesses during the term of this Agreement.

---

[1] To be clear, Brokerage Concepts, Inc. and its parent company BCI Holdings Co. are separate Pennsylvania corporations; both parties refer to the entities collectively as "BCI."

[2] The court uses the terms "clients" and "customers" interchangeably for the purposes of this memorandum.

(ASA § VII.).³

In September 1999 – the month after the ASA was signed – Sullivan informed Katz that CHF's parent company, CHFA, Inc., had decided to form a new sister company to CHF, named Performax, which would have a different business model: it would design, sell, manage, and administer employee health and benefits plans.  In particular, whereas CHF was not a licensed TPA, Performax would obtain the necessary licenses to serve as a TPA for self-funded plans.  As a result, Performax could contract directly with the former CHF clients as the primary TPA, leaving BCI to perform the more limited function of claims administration.

In March 2000, Sullivan wrote to Katz that Performax was ready to begin performing as the customers' TPA in BCI's place, and attached a proposed ASA between Performax and BCI. (Defs.' Opp'n, Ex. A.)⁴  Despite extensive negotiations, no such ASA was ever signed.⁵  Instead, BCI and Performax signed a more limited agreement in June 2000 to cover the immediate transition of billing and eligibility functions.  (Pls.' Mot., Ex. E.)  The June 2000 contract did not

---

³ In addition, this section of the ASA included a provision that reads as follows:
In the event of a breach or a threatened breach of this Section, the parties hereto agree and acknowledge that the remedy at law for any breach or threatened breach shall be inadequate and the disclosing party shall be entitled to an injunction restraining the receiving party from committing or continuing to commit any such breach, without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law.  Nothing contained herein shall be construed as prohibiting the non-breaching party from pursuing any other remedies for such breach or threatened breach.
*Id.* § VII.

⁴ To distinguish the two sets of briefs filed as to the present issue, citations to the briefs regarding the plaintiffs' motion for a TRO or a renewed motion for preliminary injunction will be labeled "Mot. for TRO."

⁵ The parties dispute the extent to which the issue of restrictive covenants was a bone of contention in these negotiations.

contain a restrictive covenant. The transition of TPA services to Performax was completed in the first financial quarter of 2001. According to BCI, it agreed to create a specialized unit of employees who would work only on Performax cases in return for Performax's promise to supply BCI with a sufficient stream of cases to keep the unit employed. (Declaration of Arnold M. Katz ¶ 13, Defs.' Opp'n, Ex. 1.) This unit of BCI answers the phone as "Performax" and uses the Performax logo on all correspondence with its customers. In 2005, Performax and BCI again entered negotiations for a more comprehensive ASA, but no contract was ever finalized. Currently, Performax divides its claims administration subcontracts among BCI and two other entities.

It is not clear what business CHF has conducted, or what relationship it has had with BCI, since the 2001 transition. According to BCI, CHF ceased performing its role as prescribed by the ASA at that point. (Katz Decl. ¶ 10.) The plaintiffs, however, submitted several checks written from BCI to CHF in 2002, 2003, 2004, and 2005, which refer to commissions. (Pls.' Rep., Ex. 5.) According to the plaintiffs, Performax and CHF are separate but very closely aligned corporations: they share the same directors, officers and employees, as well as accounts, offices, and insurance policies. When Performax was founded both it and CHF were subsidiaries of CHFA, but CHF became a wholly-owned subsidiary of Performax in August 2004.

When, on several occasions prior to September 2005, BCI was presented with an opportunity to contract directly with a Performax client, Katz would contact Performax and express his view that he could not or would not accept such business without the latter's permission. (*See* Pls.' Mot., Exs. F, G.) According to Katz, he took this position out of business courtesy rather than because of any perceived legal obligation. (Katz Decl. ¶ 15.) In any event,

Katz changed his position in September 2005, when he expressed his view in a meeting with Performax executives that BCI was free to contract with Performax customers. Katz made this decision due to his perception that Performax had begun sending fewer new cases to BCI and more to another subcontractor, in effect breaking its promise to send a steady flow of business to BCI. (Katz Decl. ¶ 19; PI Hr'g Tr. 117-21, Feb. 21, 2006.)[6]

Prior to September 2005, Katz received numerous inquiries from an insurance broker, Don Mollihan, regarding two Performax clients, Beus Gilbert and Progressive Services, Inc., who were interesting in switching to BCI.[7] After repeatedly declining to entertain Mollihan's proposals, BCI changed its mind in October 2005 and began negotiations with both companies. Although Progressive decided not to switch TPAs after receiving notice from Performax that it intended to bring this lawsuit, Beus Gilbert entered into a contract with BCI that began on January 1, 2006.[8]

BCI further admits that, since the hearing was held, it has been in communication with several other Performax clients, including Experience Works, Surface Technology Corporation,

---

[6] According to BCI, between February 21 and June 21, 2006, Performax removed BCI from 88 of the 143 cases it had serviced prior to that time, representing over 13,000 lives and 62% of BCI's block of business. (Supplemental Declaration of Arnold M. Katz ¶ 3, Def's Opp'n to TRO, Ex. A.)

[7] According to both parties, brokers play a crucial intermediary role in this segment of the health insurance industry. For example, a self-insured company interested in seeking a new TPA usually works through a broker, who in turn asks companies such as BCI or Performax to submit price quotes. It likewise appears that TPAs aim to develop relationships with particular brokers, who can then recommend their services to clients.

[8] In addition, BCI has contracted with Allstate Power Vac, which ceased being a Performax customer in August 2003, went fully insured with Aetna, and then became a direct client of BCI in April 2004. According to BCI, it notified Performax of this arrangement but received no objections at that time.

and Securities Training Corporation. (Katz Supp. Decl. ¶¶ 3-11.) In some instances, BCI merely responded to initial inquiries or submitted a bid to a broker. In the case of Surface Technology and Securities Training, however, BCI signed contracts to serve as their TPA as of July 1, 2006. In addition, Katz sent a form letter on or about June 9, 2006, ostensibly to all of the Performax customers that BCI services, asking the customers to resist Performax's intention to remove BCI from their contracts, inviting them to contact Katz to hear "both sides of the story," and noting BCI's desire to continue serving the customers "on Performax's behalf."[9] (Pls.' Mot. for TRO, Ex. B.) The plaintiffs contend that despite such references to Performax, the letters are veiled attempts by BCI to solicit these customers, even if indirectly. BCI denies this contention and asserts that, as of June 19, it had not received any phone calls in response to the letters. (Katz Supp. Decl. ¶ 24.)

Performax views its complete client list as closely-guarded proprietary information. (Hr'g Tr. 56.) Although BCI obviously knows which customers it services, it is not privy to the identities of those Performax clients serviced by other subcontractors. (Hr'g Tr. 127.) On March 17, 2006, however, BCI received a spreadsheet via email listing all of Performax's clients, apparently from a now-former Performax employee. Other than an unusable printed copy and archival backup tapes, BCI has destroyed all versions of this email. (Defs.' Opp'n to TRO, Ex. 1.) The parties submitted a stipulated protective order, signed by the court on May 26, 2006, that bars BCI from using or disclosing this client list.

---

[9] BCI also called dozens of Performax customers and brokers between March and May 2006 to convey a similar message. (Katz Supp. Decl. ¶ 15.)

II. Standard of review

In considering whether to issue a preliminary injunction, the court must weigh and evaluate the evidence to assess four interrelated factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991); *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 195 (4th Cir.1977). The "[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir.1991) (citations omitted).

The court must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction is denied; if such a showing is made, the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant. *Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 858-59 (4th Cir.2001); *Direx Israel*, 952 F.2d at 812. If the balance of the hardships "tips decidedly in favor of the plaintiff," *Rum Creek*, 926 F.2d at 359 (internal quotation marks omitted), then typically it will "be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation," *Blackwelder*, 550 F.2d at 195 (internal quotation marks omitted). But if the balance of hardships is substantially equal as between the plaintiff and defendant, then "the probability of success begins to assume real significance, and interim relief is more likely to require a clear showing of a likelihood of success." *Direx Israel*, 952 F.2d at 808 (internal quotation marks omitted).

III. Analysis

    A. Irreparable harm to the plaintiffs

The court begins by noting that most of the law regarding restrictive covenants pertains to contracts between employers and individual employees, whereas the covenant at issue here was negotiated by two sophisticated business entities. While this is a significant distinction, the subcontractor relationship between BCI and CHF and/or Performax does resemble an employment contract in several respects. Accordingly, much of this well-developed area of the law is relevant to this case, while certain underlying considerations – e.g. comparative bargaining power – apply differently in this context.

"Irreparable harm is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (citation omitted). Accordingly, "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Id.* at 552 (citing *Merrill Lynch, Pierce, Fenner and Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)). In describing the legitimate business interests an employer can protect through a restrictive covenant, the Maryland Court of Appeals has stated that "[p]ersons in business have a protectable interest in preventing an employee from using the contacts established during employment to pirate the employer's customers." *Holloway v. Faw, Casson & Co.*, 572 A.2d 510, 515 (Md. 1990) (citing cases).[10] The *Holloway* court also noted the distinction between an employer's legitimate interest in preventing an employee from appropriating its good will through direct customer

---

[10] The parties do not dispute at this point that Maryland law governs in this case.

contacts, and an illegitimate desire to hamstring a former employee who has become merely a "more efficient competitor." *Id.* (quoting *Silver v. Goldberger*, 188 A.2d 155, 158 (Md. 1963)); *see also Becker v. Bailey*, 299 A.2d 825, 838-39 (1973).

Performax faces potential appropriation and deterioration of its goodwill through BCI's course of conduct. Although BCI largely disguises its identity behind the Performax name in performing its claims administration functions, it nonetheless develops relationships with Performax customers and their brokers thanks to its position. *See generally* Declaration of Don Mollihan, Defs.' Opp'n, Ex. 2; Affidavit of Sherrie Knoff, Pls.' Rep., Ex. B. In soliciting or negotiating with current or former Performax customers, BCI derives great advantage from these contacts and the goodwill generated by Performax. Furthermore, BCI benefits greatly from the infrastructure developed through its relationship with the customers, which would make a customer's transition from Performax to BCI much less burdensome. Setting up a new claims administrator or TPA seems to involve numerous processes and transfers of information, much of which a customer would not need to repeat if it transferred from Performax to BCI.[11] For example, plaintiffs submitted an affidavit from Progressive's benefit administrator, who confirmed that two important factors motivating its decision to explore switching from

---

[11] BCI makes the argument that such "seamless transitions" only give it an advantage vis-a-vis other TPAs who would compete for the customer's business, not vis-a-vis Performax, to the extent that remaining with Performax would always be the most seamless option. Stated differently, BCI's position only makes it more attractive to customers who have already decided to leave Performax anyway. The court does not find this argument completely persuasive. First, the court can envision customers who are not completely satisfied with Performax, but who would nonetheless stay with the company but for the prospect of seamlessly transitioning to BCI (i.e. this factor tips the balance). In addition, BCI cannot deny that the seamless nature of the transition would be due to the fact that Performax brought the customer into contact with BCI in the first place.

Performax to BCI were the cost savings and seamless quality of the transition. (Knoff Aff. ¶ 11.)

Moreover, BCI's conduct could critically undermine Performax's business model. Similar to a general contractor, Performax must invest substantial resources up front in attracting and developing new customer relationships; it can sometimes take several years of interaction to gain a new customer, and Performax only succeeds in contracting with a small fraction of the businesses it solicits. (Hr'g Tr. 45-50.) Once such relationships are formed, however, much of the actual work is handled by subcontractors such as BCI. Contracts in this field are generally renewed on a yearly basis; if, at renewal time, a subcontractor could sidestep Performax by contracting directly with the customer, Performax would suffer the unquantifiable loss of its goodwill and investment of resources. Performax thus rationally views restrictive covenants as essential to its business model. In sum, BCI is not merely a more efficient competitor; instead, it gains an unfair competitive advantage in competing for these companies' business thanks to Performax's goodwill and investments, as well as the customer contacts it has made because of its relationship with Performax.[12]

Regarding the immediacy requirement, it is sufficient that the plaintiffs have demonstrated a present threat of irreparable harm. *See Direx Israel*, 952 F.2d at 812, 816. They do not need to show that BCI definitely or necessarily will continue its course of conduct; it is enough that they have demonstrated BCI's present intent to seek contracts with former Performax clients, even if not through direct solicitation. There can be no clearer evidence of this intent than the fact that BCI has entered into new contracts with former Performax clients

---

[12] Because the court is persuaded that Performax would suffer irreparable harm based on these factors, there is no need to discuss the plaintiffs' other theories of harm based on BCI's access to confidential information or trade secrets, which are less persuasive in any event.

since the hearing. Mr. Katz also has indicated that he would not turn away any current or former Performax customer, or an affiliated broker, who wants to discuss working with BCI directly. (Supp. Katz Decl. ¶ 13.) In sum, the plaintiffs have made a strong showing of irreparable harm that is "actual and imminent" rather than "remote or speculative." *Direx Israel*, 952 F.2d at 812.[13]

    B. <u>Harm to BCI</u>

BCI, on the other hand, has not shown that it will face significant harm if it is barred from soliciting or accepting business from Performax clients with whom it has had contact. *Cf. Intelus Corp. v. Barton*, 7 F.Supp.2d 635, 640 (D.Md 1998) (finding that employee had not shown that "he would suffer more than the usual stress and economic inconvenience that accompanies a change in employment").

To the extent the plaintiffs seek a preliminary injunction that only functions prospectively, such relief would not directly cause BCI to lose any current customers. Although it is true that BCI will lose the opportunity to compete for new business from other Performax customers, there is a substantial difference between BCI's loss of potential customers and Performax's loss of current customers. BCI contends that many of the companies with whom it would contract already intend to leave Performax, meaning that it will suffer the loss of these potential customers while Performax would have lost them anyway. Although BCI submitted an

---

[13] While the ASA's provision regarding the inadequacy of legal remedies may be considered by the court, it is not alone sufficient to support a finding that the harm suffered by the plaintiffs would be irreparable. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004).

emphatic letter from Beus Gilbert that supports its position (Defs.' Opp'n, Ex. 3), the example of Progressive calls this general proposition into question. Progressive initially entered into negotiations with BCI but decided to stay with Performax after receiving notice of this litigation rather than switching to an unrelated TPA. This suggests that BCI's efforts could potentially cost Performax clients who, in fact, would not leave otherwise.

BCI also contends that injunctive relief will cause it harm by giving Performax a greater ability to terminate BCI from its cases, inasmuch as the order will provide "cover" against BCI's efforts to contract with those customers directly. It seems to be within Performax's rights to terminate BCI from its cases, however; there is no written contract barring such action and BCI's argument that this violates an oral agreement does not appear strong.[14] Furthermore, Performax has apparently followed through on this initiative even without any court order in place, which undercuts BCI's theory.[15]

In sum, the court finds that the balance of harms "tips decidedly" in favor of the plaintiffs. *Direx Israel*, 952 F.2d at 814.

C. Merits

Accordingly, to meet the third criterion, the plaintiffs need only "rais[e] questions going

---

[14] As one of several counterclaims, BCI contends that this pattern of termination constitutes a breach of oral contract or a breach of the duty of good faith and fair dealing, in regards to which the plaintiffs have filed a motion to dismiss. The court will address this issue in a separate memorandum.

[15] BCI's contention that the Performax customers with whom it already has contracted would suffer harm from an injunction is moot, given that these contracts will not be affected by the relief as granted. Furthermore, harm to third parties would only be relevant to the public interest element, not to the balance of harms suffered by the parties themselves.

to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Rum Creek*, 926 F.2d at 359. The plaintiffs have satisfied this burden. Although the court has reached no final conclusion regarding the merits, it cannot deny that the plaintiffs have raised substantial and difficult questions that require further development. *See also Direx Israel*, 952 F.2d at 817 ("If the hardship balance tilts sharply and clearly in the plaintiff's favor, the required proof of likelihood of success is substantially reduced."). Although the plaintiffs bear the burden as to this element, the court will assess the merits in light of the defendants' arguments.

First, the defendants have argued that neither plaintiff is in a position to enforce the 1999 ASA. At first glance, this argument seems misplaced: CHF signed a contract with a restrictive covenant that protects both itself and its "affiliates," Performax appears to be such an "affiliate," and Performax alleges that its customer relationships are at stake.[16] On the other hand, it is unclear whether CHF, even as a wholly-owned subsidiary of Performax, has standing to enforce the ASA on Performax's behalf. *See Holloway*, 572 A.2d at 515-16 (restrictive covenant is enforceable to extent it protects legitimate business interests of enforcing party). Likewise, it is not clear whether Performax can enforce the contract itself: it did not formally assume CHF's place under the ASA, and it was not in existence when the ASA was written, in terms of its potential status as a third party beneficiary. *See Weems v. Nanticoke Homes, Inc.*, 378 A.2d 190, 195 (Md.App. 1977). Resolution of these questions requires further factual development, but the court finds sufficient at this point the plaintiffs' contention that one or both likely are in a

---

[16] The parties dispute whether Performax qualifies as an "affiliate" under the ASA. Without fully resolving the issue, it initially appears that Performax would qualify under a reasonable reading of the term.

position to enforce the ASA.

Second, BCI argues that the ASA expired well over three years ago, either because (a) CHF materially breached the ASA by ceasing performance after Performax took over its customers, or (b) the June 2000 agreement between Performax and BCI constituted a novation. The court is not prepared to agree with BCI as to either theory at this point. As for the former, BCI claims that with the advent of Performax, CHF stopped performing its role as prescribed by the ASA. On the other hand, that BCI remitted several checks to CHF between 2002 and 2005 suggests that the two entities have maintained some relationship independent of Performax. Likewise, the standard for finding a novation under Maryland law is fairly stringent, and the court would need further information about the circumstances surrounding the June 2000 agreement, which on its face does not mention the ASA. *See Dahl v. Brunswick Corp.*, 356 A.2d 221, 227 (1976).

Third, the defendants argue that the covenant as it stands is unenforceable in one or more respects. It is settled Maryland law that "[a] covenant not to compete is enforceable if its duration and geographic area are only so broad as is reasonably necessary to protect the [enforcing party's] business, and if the covenant does not impose undue hardships on the [other party] or the public." *Intelus*, 7 F.Supp.2d at 641 (citing *Holloway*, 572 A.2d at 515).[17] Because both companies engage in business nationally, and the restrictive covenant delineates its coverage by former customers rather than by geographic area, its national scope does not appear unreasonable. *See Intelus*, 7 F.Supp.2d at 641-42. Likewise, the court cannot say at this point

---

[17] Although this standard was crafted in the context of an employer/employee contract, there is no reason to think that it does not apply equally to contracts such as the one at issue here, with appropriate adjustments to the content of reasonableness and undue hardship.

that the three-year restriction is necessarily overbroad, in light of the yearly cycle of the industry and the sophistication of the parties.  *See Holloway*, 572 A.2d at 522-524.

The court does have concerns as to the reasonableness of the covenant's scope to the extent it would prevent BCI from soliciting or accepting business from those customers of CHF or its affiliates with whom BCI never had contact.  *See Holloway*, 572 A.2d at 520-21; *Deutsche Post Global Mail, Ltd. v. Conrad*, 292 F.Supp.2d 748, 755-56 (D.Md. 2003), *aff'd*, 116 Fed.Appx. 435 (4th Cir., Nov. 19, 2004); *Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600, 608 (D.Md. 2002); *but see Fowler v. Printers II*, 598 A.2d 794, 799-802 (Md.App. 1991).  BCI apparently has had no professional contact with Performax customers serviced by other subcontractors; indeed, Performax deliberately conceals their identities from BCI.  As a result, it is difficult to discern what unfair advantage BCI would possess in dealing with these entities.  On the other hand, although the complete factual circumstances surrounding BCI's receipt of Performax's client list are not before the court, the event might suggest that Performax has reason to be concerned about these other customers.

In addition, BCI argues that the covenant is unreasonable to the extent it covers "affiliates" of CHF even if such entities were not in existence at the time the contract was executed, as in the case of Performax.  There might be some merit to this argument, but the court is not fully persuaded at present.  A certain amount of corporate expansion or restructuring is almost always reasonably foreseeable in the contemporary business climate.  In addition, the phrase has not significantly expanded the scope of the covenant as a practical matter, inasmuch as CHF appears to have transferred its entire customer base to Performax.  *Cf. Deutsche Post*, 292 F.Supp.2d at 753 n.2.  The court does not find that the covenant as written would necessarily

15

impose an undue burden on BCI, especially considering that it has the ability to conduct business nationally and there are apparently thousands of potential customers not covered by the covenant. In sum, although the court has some concerns as to the validity of the covenant's scope, it is not presently prepared to hold that the covenant is unreasonable.

Finally, even if the court does find that the covenant is unreasonable in one or more respects, there is an open question whether Maryland law would allow it to enforce the covenant only partially. If limiting enforcement of the covenant to Performax clients serviced by BCI could not be accomplished by merely deleting words in the provision, such a change might not be permissible under the traditional "blue-penciling" doctrine. *See Deutsche Post*, 292 F.Supp.2d at 756-58. If, however, the "flexible" approach is valid under Maryland law, at least under the specific facts of this case, then such limited enforcement might be permissible. *See Holloway v. Faw, Casson & Co.,* 522 A.2d 1311, 1327-28 (Md.App. 1998) (adopting flexible approach); *Holloway*, 572 A.2d at 524 (noting "provocative questions" raised by Court of Special Appeals but declining to adopt or reject flexible approach). At this point, the plaintiffs have made a colorable argument that even if the court finds one or more aspects of the covenant to be unreasonable, it would not necessarily be prohibited from partially enforcing the covenant under Maryland law.

In summary, although the court is not convinced that the plaintiffs will prevail on the merits entirely, they have certainly "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Rum Creek*, 926 F.2d at 359.

D. <u>Public interest</u>

The plaintiffs have likewise sufficiently demonstrated that issuing a preliminary injunction would be in the public interest. In general, "the public has an interest in the enforcement of reasonable restrictive covenants." *Intelus*, 7 Supp.2d at 642. In most cases involving restrictive covenants in employment contracts, there is a tension between the policy against undue burdens on competition and that in favor of respecting freedom of contract. In this case, BCI's sophistication obviates the concern that it was subjected to unequal bargaining power, and there appears to be a wide market to which BCI will have access in any event. The court is not persuaded by BCI's argument that, to the extent restricting a company's ability to choose a TPA might hamper its ERISA fiduciary duties, public policy is implicated in this industry more so than in others. BCI cannot plausibly suggest that it is the only company capable of performing TPA functions in a way that would fulfill a Performax customer's fiduciary duties. In addition, the preliminary injunction crafted by the court will minimize the impact on third parties, given that it will not prevent BCI from performing under its current contracts.

IV. <u>Conclusion</u>

In sum, the plaintiffs have met their burden in seeking a preliminary injunction. However, the court will issue an injunction limited to the scope of the TRO already in place. In other words, BCI will only be barred from soliciting or accepting business from those customers of CHF and/or Performax with whom it had a client service relationship during the intended term of the ASA, and only prospectively. To be clear, taking this approach does not require the court

17

to decide conclusively whether it has the ability to enforce the restrictive covenant in this manner. The court has broad equitable powers to craft appropriate injunctive relief to preserve the status quo, and this relief is tailored to address the particular threat presently facing Performax while minimizing the burden on BCI and third parties. Whether the restrictive covenant is unreasonable, whether the court can partially enforce it, and whether either or both plaintiffs have the right to enforce it in the first place, are among the issues that can and must await further development by the parties.

A separate Order follows.


July 13, 2006                                          /s/
Date                                                   Catherine C. Blake
                                                       United States District Judge