IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CORPORATE HEALTHCARE :
FINANCING, INC. :
 :
 v. : CIVIL NO. CCB-05-3391
 :
BCI HOLDINGS CO. :
...o0o...

## MEMORANDUM

The plaintiffs, Performax, Inc. ("Performax") and Corporate Healthcare Financing, Inc.

("CHF"), filed this suit against defendants BCI Holdings Co. and Brokerage Concepts, Inc.

(collectively, "BCI"), alleging that BCI has violated, and will continue to violate, a restrictive

covenant in a 1999 contract between BCI and CHF, for which they seek injunctive, declaratory,

and monetary relief.  As part of its answer, BCI asserted nine counterclaims against the

plaintiffs, including two counts alleging violations of the Racketeering Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1961 *et seq.*, and seven common law counts.  The plaintiffs have

filed a motion to dismiss three counterclaims: Count Seven ("Civil RICO"), Count Eight ("RICO

Conspiracy"), and Count Nine ("Breach of Contract/Breach of Duty of Good Faith and Fair

Dealing").  The issues have been fully briefed and no hearing is necessary.  *See* Local Rule

105.6.  For the following reasons, the motion will be granted as to all three counterclaims.

I.  Background

This memorandum will discuss only the facts of this case relevant to BCI's

counterclaims, and will assume familiarity with the court's previous ruling, which granted a preliminary injunction in favor of the plaintiffs. *See* Mem. & Order of Jul. 13, 2006 (docket entry nos. 75 & 76).

Performax serves as a third-party administrator ("TPA") for hundreds of companies that self-insure their health plans. While it handles the billing and eligibility functions, Performax subcontracts the claims administration component to three companies, including BCI and North American Health Plans, Inc. ("NAHP").[1] Subcontractors such as BCI and NAHP realize savings for the client plans through three methods: (1) negotiating reductions on large claims, (2) the use of "passive" PPO networks,[2] and (3) subrogation recoveries. The subcontractors generally bill Performax through administrative fees calculated on a per-employee-per-month basis. Performax then bills the clients directly, adding its own charges to those incurred by the subcontractors.

Performax and BCI entered into a written contract in 2000, which covered the transition of billing and eligibility functions for certain customers from BCI to Performax but did not provide for a minimum or target volume of business going forward.[3] (Am. Countercls. ¶ 1 & Ex.

---

[1] NAHP recently changed its name to Meritain Health, but both parties refer to it as NAHP. Neither party considers the third, unidentified subcontractor relevant for the purposes of this issue, given that Performax ceased assigning it new clients several years ago.

[2] Neither party has provided a complete explanation of this practice, but it seems to involve the use of health care networks arranged by TPAs rather than by the clients themselves.

[3] As discussed in the court's earlier ruling, CHF and BCI had entered into an Administrative Services Agreement ("ASA") in 1999, whereby BCI would, *inter alia*, handle the billing and eligibility services while CHF would handle marketing and other services. Soon thereafter, CHF's parent company created Performax, which would operate under a more comprehensive business model. Although Performax and BCI conducted negotiations for their own ASA, none was ever signed, but they signed the more limited agreement in June 2000 to cover the transition of the billing and eligibility functions.

1)[4]  BCI claims there also was an oral contract as part of its arrangement with Performax,

whereby Performax insisted that BCI create an employee unit dedicated to Performax clients and

in turn agreed "to provide a continuing flow of new cases to BCI, sufficient to keep the dedicated

unit employed" (¶ 49).  For the first several years of their relationship, Performax "divided new

cases between BCI and [NAHP] in equal numbers" (¶ 50).  Then, starting in 2003, Performax

began sending fewer new clients to BCI, giving "the great majority" to NAHP instead (¶ 53).

At the center of BCI's RICO claims is its allegation that when NAHP achieves savings

for a Performax client, through any of the three aforementioned methods, Performax allows

NAHP to keep 25% of the money as a "commission" without the client's knowledge or consent

(¶¶ 54, 68).[5]  BCI contends this practice amounts to taking the plans' assets fraudulently.  NAHP

accounts for these commissions in its bills to Performax, which then sends the clients bills and

reports that only indicate the net savings, without specifying the portion kept by NAHP (¶¶ 75,

138-142).  For example, if NAHP negotiated a $10,000 claim payment down to $6,000, it would

keep $1,000, and Performax would indicate to the client merely that its obligation had been

reduced to $7,000.  BCI claims that NAHP has reduced its regular charges to Performax thanks

to this arrangement, which amounts to kickbacks in BCI's view (¶¶ 53, 56, 66).[6]  In return,

---

[4] Citations are to the amended counterclaims, which BCI filed after Performax filed its motion to dismiss.  Performax did not object, and stated that all of its motions' arguments apply equally to the amended counterclaims.

[5] BCI understandably does not refer to the practice as taking commissions, but the court does so solely for the sake of convenience.

[6] BCI also makes the more serious allegation that NAHP has sent direct cash payments to Performax, but it does so based only on a vague reference to "conversations with Jake Canova" (¶¶ 57, 72). The amended counterclaims include an additional allegation that Performax has engaged in illegal practices regarding undisclosed receipt of profitability bonuses from insurers and payments from pharmacy benefit managers (¶ 73).  BCI makes no factual assertions to

Performax sends more clients and/or larger cases to NAHP than to BCI.

The complaint also asserts that, at some point, Performax was investigated by the Department of Labor for its disclosure practices, and that BCI's President Arnold Katz answered subpoenas related to the investigation (¶ 62). BCI "believes" that Performax was forced to return funds to 20-30 of its clients, but fully admits that it is "not privy to the exact nature of the disclosure violations that DOL has found, if any" (¶ 63).

BCI claims to have learned of NAHP's practice of taking commissions from Jake Canova, the current head of Performax, and from Ron Zeller, a former NAHP president (¶ 66). Zeller also told BCI that NAHP was able to lower its rates to Performax by taking such commissions (*Id.*). BCI only relates these allegations, however, to NAHP's commissions for passive PPO and negotiated claims reductions (¶ 70); its allegations related to subrogation recoveries are based solely on an NAHP proposal to a non-Performax client, which disclosed that it takes 25% of such recoveries (¶¶ 71, 145). BCI's contention that Performax does not disclose the commissions to clients are based on statements by former and current Performax and NAHP executives explaining that Performax has not had written agreements with many of its clients (¶¶ 64, 156-58). Further, BCI alleges that those client agreements that have existed do not disclose the commissions (¶¶ 65, 159-60).[7] BCI asserts that the affected client plans would

support this allegation and neither party discusses them in their briefs.

[7] In its opposition brief, however, BCI asserts that these documents have never been disclosed to it; it thus apparently had no factual basis for making this assertion. (Defs.' Opp'n, at 13.) In addition, BCI tries to rely on a 2005 report by Performax's venture-capital owner, which states that Performax had been able to "negotiate more lucrative contracts with several of the company's larger vendors" (¶ 66). This statement does not refer to NAHP, however, and does not necessarily suggest that any fraud took place.

be "outraged" if they knew the true state of affairs (¶ 163).

BCI further claims that, in 2004, Performax and Canova began pressuring BCI to participate in this scheme by taking assets in the same manner as NAHP and reducing its charges to Performax (¶¶ 79-80).  In particular, "Canova and Performax began to pressure BCI by turning off the spigot of new cases on which BCI depended, and sending those cases to NAHP instead" (¶ 81).  The complaint describes a conversation between Canova and Katz on September 22, 2005, in which Katz protested the declining number of new cases sent to BCI and Canova replied that BCI charged higher rates than NAHP.  Katz attributed this fact to NAHP's "unlawful" practices, to which Canova replied: "You could do the same" (¶¶ 84-86).  Another similar conversation took place on December 7, 2005 (¶ 87).  BCI makes the specific allegations that Performax has terminated two of its cases and transferred them to NAHP, and has threatened to continue this trend (¶ 88a-c).[8]

Performax attached to its motion to dismiss copies of its generic client service agreements ("CSA"), in order to demonstrate that Performax made sufficient disclosures to its clients.[9]  After BCI contested the relevance of these generic forms and the court's ability to consider them on a motion to dismiss, Performax submitted copies of the actual CSAs for 129 clients serviced by NAHP, with identifying information redacted.[10]   The Schedule of Services

---

[8] According to BCI, between February 21 and June 21, 2006, Performax  removed BCI from 88 of the 143 cases it had serviced prior to that time, representing over 13,000 lives and 62% of BCI's block of business.  (Supplemental Declaration of Arnold M. Katz ¶ 3, Def.'s Opp'n to TRO, Ex. A.)

[9] Performax submitted a copy of the CSA it used after June 2003 and a revised CSA used since June 2005.  The relevant paragraphs are identical.

[10] According to the affidavit of Performax's contracts supervisor, of the 139 clients that NAHP has serviced since 2003, 129 received a CSA and all but six of these executed their CSAs.

and Fees in these CSAs contains the following language:

> **PERFORMAX Out of Network Discount Program Fees** – To be billed on a
> contingent fee basis (based on a percentage of savings) as set forth in the General
> Provisions of this Agreement.

(Pls.' Mot. to Dismiss, Ex. 1 & 2, at iii).  The General Provisions contain the following

paragraph:

> **PERFORMAX Out of Network Discount Program.** Because the Client and
> PERFORMAX cannot accurately predict either the percentage of Covered
> Persons that will utilize out-of-network providers, or the amounts that such
> providers will charge for their services, the parties agree that PERFORMAX's
> Medical Plan Administration Service Rates do not apply to negotiation of
> discounts of the charges submitted by out-of-network providers. PERFORMAX
> agrees to use commercially reasonable efforts to negotiate reductions in charges
> assessed by out-of-network providers on a case-by-case basis. Client agrees to
> compensate PERFORMAX for obtaining such reductions by Client's payment to
> PERFORMAX of a contingency fee (based on a percentage of savings) at a
> commercially reasonable rate. This rate shall be presumed to be 30% of the
> amount of the reduction unless the effort to obtain the reduction on the Client's
> behalf is disproportionate to the fee, in which case, PERFORMAX shall increase
> or decrease the rate in relation to that effort and industry custom and practice.
> Client further agrees that PERFORMAX may engage on Client's behalf and at
> Client's expense third parties to assist in obtaining fee reductions from
> out-of-network providers.

(*Id.* at Section 2.3.2.)  Another paragraph states:

> **Other Compensation to PERFORMAX.**  Client agrees and directs
> PERFORMAX to retain commissions, administrative fees, and other
> compensation ("Other Compensation") received by PERFORMAX in connection

---

(Pls.' Reply, Ex. A.)

     A court may consider documents submitted in support of a motion to dismiss if they are
"integral to and explicitly relied on in the complaint." *American Chiropractic Ass'n v. Trigon
Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (citation omitted).  Here, although the
content of the CSAs goes to the heart of BCI's RICO claims, BCI had no prior access to these
documents and thus cannot be said to have "relied on" them in drafting its complaint.  In any
event, the language of the CSAs is not relevant to the court's disposition of the case, and is
discussed only to illustrate the basic contours of the parties' dispute.  Inasmuch as BCI's motion
for leave to file a surreply seeks only to respond to these CSAs, it will be denied.

with services provided or arranged for the Plan.

(*Id.* at Section 2.2.)  It is unclear whether the CSAs Performax has with those clients serviced by

BCI contain these or similar paragraphs.

Performax does not dispute that NAHP takes at least some commissions from its clients,

but asserts that everything has been done lawfully and that its disclosures were adequate.  In

particular, Performax states that the CSA specifically discloses commissions for passive PPO

discounts and negotiated claims reductions, and contends that the more general language of

Section 2.2 covers subrogation recoveries.  Performax has not, however, addressed the level of

disclosure in the bills and reports sent to clients serviced by NAHP.


II. Standard of review

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint;

importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of

a claim, or the applicability of defenses."  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th

Cir. 1999) (internal quotation marks and alterations omitted).  When ruling on such a motion, the

court must "accept the well-pled allegations of the complaint as true," and "construe the facts

and reasonable inferences derived therefrom in the light most favorable to the plaintiff."  *Ibarra

v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Consequently, a motion to dismiss under

Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no

set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355

U.S. 41, 45-46 (1957); *see also Edwards*, 178 F.3d at 244.  In addition, because the court is

testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal

conclusions.  *See, e.g.*, *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) (noting

that the "presence . . . of a few conclusory legal terms does not insulate a complaint from

dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions);

*Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995) (affirming Rule 12(b)(6) dismissal with

prejudice because the plaintiff's alleged facts failed to support her conclusion that the defendant

owed her a fiduciary duty at common law).


III. <u>Analysis</u>

     A. <u>RICO claims</u>

     The RICO Act prohibits certain conduct involving a "pattern of racketeering activity."

18 U.S.C. § 1962.   The Act provides a private right of action, with a treble damages remedy, to

"[a]ny person injured in his business or property by reason of a violation" of the Act's

substantive restrictions. § 1964(c).  BCI alleges that Performax has violated § 1962(c), which

makes it illegal "for any person employed by or associated with any enterprise engaged in, or the

activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or

collection of unlawful debt."  *Id.* § 1962(c).  BCI alleges that Performax has committed mail

fraud, wire fraud, embezzlement, extortion, and receipt of kickbacks, which are among the

predicate acts enumerated in the RICO Act. *See* § 1961(1).   BCI also alleges that Performax has

violated § 1962(d), which provides that "[i]t shall be unlawful for any person to conspire to

violate any of the provisions of subsection (a), (b) or (c) of this section." § 1962(d).

     The Supreme Court has construed § 1964(c) to require that the violation of RICO be a

proximate cause of the claimant's injury.  *Holmes v. Securities Investor Protection Corp.*, 503

U.S. 258, 268 (1992).  It is well-settled that "a civil RICO complaint is vulnerable to a motion to

dismiss if it fails to allege either an adequate injury to business or property...or an adequate

causal nexus between that injury and the predicate acts of racketeering activity alleged."

*Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir. 1988) (citations omitted); *see also*

*Chisholm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336-37 (4th Cir. 1996).  The court will assume

that BCI has alleged adequately that it has suffered legally cognizable injuries in the form of lost

customers and revenue.  *See Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d

260, 264 (4th Cir. 1994).[11]  Nonetheless, the court will dismiss BCI's RICO claims because it

has not shown that these injuries were proximately caused by the alleged predicate acts.

　　　The Supreme Court's recent opinion in *Anza v. Ideal Steel Supply Corp.*, --- U.S. ----,

126 S.Ct. 1991 (2006), clarifies the requirement of proximate causation under § 1964(c).[12]  In

that case, the court considered the § 1962(c) claim by Ideal, the operator of a steel mill products

store, that its principal competitor, National (owned by the Anza brothers), was engaging in an

unlawful racketeering scheme by violating the state tax laws and not charging its customers sales

---

　　　[11] The plaintiffs strenuously challenge this issue, arguing that to the extent BCI has no
property or contractual interest in its business with Performax, it has suffered merely an injury to
an "expectancy interest," which is insufficient to confer standing.  *See Strates Shows, Inc. v.
Amusements of America, Inc.*, 379 F.Supp.2d 817, 825-28 (E.D.N.C. 2005); *cf. In re American
Honda Motor Co., Inc. Dealerships Relations Litig.*, 941 F.Supp. 528, 540-42 (D.Md. 1996)
(finding standing on grounds that dealers had adequately alleged "some entitlement" to a
distribution of cars, based largely on a standard dealership agreement that provided for a
monthly allocation system).

　　　[12] The court's summary of *Anza* is largely based on Judge Rosenthal's cogent discussion
in *Downstream Environmental, LLC v. Gulf Coast Waste Disposal Authority*, 2006 WL
1875959, at *6-7 (S.D. Tex., Jul. 5, 2006).

taxes in order to gain sales and market share at Ideal's expense. According to Ideal, National committed the predicate acts of mail and wire fraud by submitting false tax returns, enabling National to charge lower prices and causing Ideal competitive injury. National moved to dismiss on the grounds that Ideal had no standing to assert a claim under § 1962(c). After the district court granted the motion to dismiss, the court of appeals reversed and the Supreme Court granted certiorari.

Taking Ideal's allegations as true and applying the principles of its earlier decision in *Holmes*, the Court held that Ideal could not maintain its § 1962(c) claim as a matter of law, because it could not plead facts showing that National's RICO violation was the proximate cause of Ideal's injury. The Court stated that the direct victim of the illegal conduct was the state tax authority, not Ideal, and that the alleged RICO violations did not cause Ideal's injury. The Court held:

> The proper referent of the proximate-cause analysis is an alleged practice of conducting National's business through a pattern of defrauding the State. To be sure, Ideal asserts it suffered its own harms when the Anzas failed to charge customers for the applicable sales tax. The cause of Ideal's asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State).

126 S.Ct. at 1997. The Court found no proximate causation as a matter of law. *Id.*

In reaching this conclusion, the Court noted that allowing such an indirect form of competitive injury to support a RICO claim would result in severe proof problems. "The injury Ideal alleges is its own loss of sales resulting from National's decreased prices for cash-paying customers. National, however, could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud. Ideal's lost sales could have resulted from factors other than petitioners' alleged acts of fraud." *Id.* at 1997. The Court explained that "[b]usinesses

lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of Ideal's lost sales were the product of National's decreased prices." *Id.* The Court also expressed concern over the "speculative nature" of the litigation required to resolve such an attenuated claim:

> A court considering the claim would need to begin by calculating the portion of National's price drop attributable to the alleged pattern of racketeering activity. It next would have to calculate the portion of Ideal's lost sales attributable to the relevant part of the price drop. The element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation. It has particular resonance when applied to claims brought by economic competitors, which, if left unchecked, could blur the line between RICO and the antitrust laws.

*Id.* at 1998.  Finally, the Court noted that "[t]he requirement of a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Id*.

The present case bears significant similarities to *Anza*.  Although Performax is not a competitor of BCI *per se*, the alleged fraud scheme – encompassing the mail fraud, wire fraud, and embezzlement claims – is directed analogously at Performax's customers, *not* at BCI.[13]  To the extent these customers consider Performax's conduct to be fraudulent, they can be expected to vindicate their rights and are in a far better position to do so.[14]  Moreover, the litigation of BCI's RICO claims would involve precisely the kind of unmanageable litigation and proof

---

[13] Even if NAHP, with Performax's approval, has been motivated by a desire to increase its share of Performax business at BCI's expense, the *Anza* court clearly stated that such motivations cannot be relied on to circumvent the proximate cause requirement.  *See* 126 S.Ct. at 1998.

[14] In addition, although the court does not know the purpose or findings of the Department of Labor investigation, the agency also is in a position to investigate and address any wrongdoing by Performax or NAHP.

problems the *Anza* court meant to prevent.  It would be extremely difficult to calculate how

much of BCI's lost profits might be directly attributable to the scheme rather than to a host of

other reasons, compared to the relative ease of determining whatever amount of money

Performax and NAHP unlawfully withheld from their customers.  *See id.* at 1998.

      BCI attempts to distinguish *Anza* on the grounds that BCI was proximately and directly

injured by the kickbacks and attempted extortion.  *See Busby v. Crown Supply, Inc.* 896 F.2d

833, 838 (4th Cir. 1990) (approving principle that a plaintiff can assert RICO claim even if his

injuries resulted from only some of the alleged predicate acts) (citing *Marshall & Ilsley Trust

Co. v. Pate*, 819 F.2d 806, 809 (7th Cir.1987)).  First, the alleged kickbacks do not remove this

case from the scope of *Anza*.  According to BCI, Performax took kickbacks from NAHP in the

form of reduced charges and possibly direct money payments; it cannot claim that Performax

somehow targeted BCI through this conduct, even assuming Performax actively solicited such

kickbacks from NAHP.   The attempted extortion allegations present a more difficult question,

given that *Anza* did not involve an allegation that National sought to induce Anza's participation

in its scheme, through extortion or otherwise.  The court nonetheless finds that BCI's allegations

of attempted extortion are insufficient to confer standing under § 1964(c).

      First of all, it is questionable whether BCI has properly stated a claim for extortion under

either the Hobbs Act or Maryland law.  18 U.S.C. § 1951; Md. Code, Crim. Law, § 3-701.  The

Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent,

induced by wrongful use of actual or threatened force, violence or fear, or under color of official

right."  § 1951(b)(2).[15]  Such extortion can be based on the use of fear of economic harm.  *U.S. v. Billups*, 692 F.2d 320, 330 (4th Cir. 1982).  Conduct that merely amounts to "hard bargaining," however, does not violate the Hobbs Act.  *See Brokerage Concepts v. U.S. Healthcare, Inc.*, 140 F.3d 494, 526 (3d Cir. 1998).  According to the complaint, Katz complained to Canova that Performax was not giving BCI enough cases, Canova responded that BCI's rates were higher than NAHP's, Katz expressed his view that NAHP charged less because it unlawfully hid its commissions, and Canova replied, "you could do the same."  By BCI's own account, Canova did not actively induce BCI to participate in the scheme, but merely responded to Katz's concerns. More importantly, the wrongful nature of Canova's statement largely turns on whether or not Performax's and NAHP's conduct actually is fraudulent at all.[16]  Bearing in mind that, even on a motion to dismiss, "[i]t is the duty of this court to seek the truth from the facts forming the basis of the plaintiff's claims and not to be beguiled by the conclusory allegations of the pleadings," *Cardwell v. Sears Roebuck & Co.*, 821 F.Supp. 406, 409 (D.S.C. 1993), Canova's words seem more akin to hard bargaining than extortion.

Even assuming that BCI has properly alleged attempted extortion, however, this would still not be sufficient to confer standing.  This case bears a strong resemblance to the long line of

---

[15] Similarly, Maryland's extortion statute prohibits obtaining money, property, or anything of value from another person with the person's consent, if the consent is induced by "wrongful threat of economic injury."  Md. Code, Crim. Law, § 3-701.

[16] The court questions whether BCI has alleged an adequate factual basis to establish that the conduct of NAHP and Performax was in fact fraudulent.  Outside of BCI's speculations and conclusory labels, the fraudulent nature of the conduct depends in large part on the particular expectations of the Performax customers, who are not before the court.  The complaint also includes a brief assertion that the scheme violates ERISA and two memoranda issued by the Department of Labor – PTE 77-9 and 84-24 – but with no substantiation (¶ 61).

cases that deny RICO standing to employees claiming they were terminated because they refused to cooperate with their employers' alleged racketeering scheme. *See, e.g., Beck v. Prupis*, 529 U.S. 494, 506 (2000), *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir. 1990); *Reddy v. Litton Indus., Inc.,* 912 F.2d 291, 294-95 (9th Cir. 1990); *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 154-55 (6th Cir. 1990); *Nodine v. Textron, Inc.*, 819 F.2d 347, 349 (1st Cir. 1987); *Cardwell*, 821 F.Supp. at 410; *see also J.S. Service Center Corp. v. General Electric Tech. Services Co., Inc.*, 937 F.Supp. 216, 221-25 (S.D.N.Y. 1996) (applying this case law to RICO suit where plaintiff company alleged that defendant company severed their contract due to former's refusal to participate in bribery scheme).  Such cases hold that, even to the extent the employee's refusal to cooperate led to the termination, the proximate cause of the plaintiff's injury would be the termination rather than the alleged predicate acts themselves.  *See, e.g.*, *O'Malley v. O'Neill*, 887 F.2d 1557, 1563 (11th Cir.1989) (plaintiffs' injury did not arise from RICO violation but "from the tangentially related decision to fire them"); *Cardwell*, 821 F.Supp. at 409 ("'The majority of federal courts view the retaliatory discharge claims brought by employees terminated because of their refusal to participate in wrongful predicate offense conduct...as not stating a RICO claim because the plaintiff is not injured by his employer's predicate criminal acts.'") (quoting David B. Smith and Terrance G. Reed, CIVIL RICO § 6.04[5][c][i] (1993)).

Here, BCI likely has not even presented a sufficient factual basis for asserting that Performax's decision to remove it from certain cases was a direct result of its refusal to acquiesce to the extortion, rather than "for any number of reasons unconnected to the asserted

pattern of fraud." *Anza*, 126 S.Ct. at 1997.[17]  Even if BCI had sufficiently alleged such a nexus, however, the cases above suggest that the proximate cause of BCI's injury would not be Performax's efforts to enlist BCI, but rather Performax's subsequent decision to remove it from the relevant cases.  Just as employees in such circumstances would have to seek redress for their injury through a wrongful termination suit, BCI could redress its injury through a breach of contract claim, which it has attempted to do.[18]

In several instances, a claimant has attempted to "overcom[e] the mountain of jurisprudence that denies RICO standing to employees who are discharged for reporting or refusing to cooperate in RICO prohibitive activities" by contending that the injury was directly caused by a RICO predicate act of extortion, but without success.  *Jones v. Enterprise Rent a Car Co. of Tex.*, 187 F.Supp.2d 670, 679, 682 (S.D.Tex. 2002); *Haviland v. Aron*, 796 F.Supp. 95, 101-02 (S.D.N.Y. 1992), *aff'd*, 986 F.2d 499 (2d Cir. 1992).  These courts found that, even to the extent extortionate conduct directly precipitated the employees' termination, the employees were not the direct target of the employer's overall scheme and could not disguise a standard "failure to cooperate" case through artful pleading.  *Jones*, 187 F.Supp.2d at 682-83; *Cardwell*, 821 F.Supp. at 409 (finding no "direct relationship" between the injury asserted and the illegal conduct alleged because "even if Sears did target Cardwell with extortion, its ultimate purpose was to defraud its customers"); *Haviland*, 796 F.Supp. at 101 ("[W]e find Haviland's allegation

---

[17] Indeed, Performax appears to have had several potential motivations for altering its relationship with BCI, including the alleged conduct underlying its own legal claims against BCI.

[18] That BCI cannot prevail on its breach of contract claim here does not undermine this general line of reasoning.

that he was penalized for refusing to yield to an attempted extortion to be indistinguishable from

other employees' claims that they were penalized for refusing to join in an unlawful scheme.");

*see also J.S. Service Center Corp.*, 937 F.Supp. at 224-25 (applying rationale of *Haviland* to

business entity's RICO claim against contractual partner).[19]  The court finds the reasoning in

*Jones* to be particularly apt in this case:

> [T]he facts in the record clearly demonstrate that Defendants' entire pattern of
> racketeering activity, as effected through the commission of mail fraud, wire
> fraud, bank fraud, *and* extortion, was aimed *solely* at pilfering profits from
> Enterprise customers and lenders, such that any proximate injuries flowing from
> Defendants' conduct fell exclusively upon the backs of such customers and
> lenders.  Jones may have been an extraneous and incidental victim of her
> employers' illegal acts, but she was *never* Defendants' intended prey.

187 F.Supp.2d at 682-83 (emphasis in original).  The rationale of these courts is supported

further by *Anza*, which noted that the proximate causation requirement serves to prevent the

severe proof problems and unmanageable litigation that would arise if such indirect victims were

permitted to bring a RICO claim based on a scheme directed towards third parties.  *See* 126 S.Ct.

at 1997. Here, BCI is attempting analogously to establish standing through isolated acts of

attempted extortion peripheral to the overall scheme in order to litigate a complex RICO claim

---

[19] These cases are distinguishable from the more rare instances where a plaintiff has
sufficiently alleged an injury directly resulting from alleged extortion or attempted extortion that
goes to the heart of the RICO scheme itself. *See Terminate Control Corp. v. Horowitz*, 28 F.3d
1335, 1346 (2d Cir. 1994) (declining to reverse on standing grounds because contractor plaintiff
was direct target of government inspectors' extortion scheme); *Cobb v. Sheahan*, 385 F.Supp.2d
731, 737 (N.D.Ill. 2005) (plaintiff's allegations centered on sheriff's pattern of extortion aimed
at employees for political contributions; thus, plaintiff sufficiently alleged that "her demotion
was by reason of the extortionate scheme" itself); *see also Battlefield Builders, Inc. v. Swango*,
743 F.2d 1060 (4th Cir. 1984) (reversing district court's dismissal of RICO claim based on
alleged extortion scheme directed at plaintiff); *cf. J.S. Service Center Corp.*, 937 F.Supp. at 224
(distinguishing *Terminate Control Corp.* on these grounds).

that properly belongs, if at all, to the affected customers of Performax.[20]  The court is similarly

unable and unwilling to hold that the law would countenance such an application of the RICO

Act and its severe remedies.

In sum, the court concludes that BCI's allegations of attempted extortion are insufficient

to remove this case from the ambit of *Anza*, under which BCI lacks standing.  *See also James*

*Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 403-04 (7th Cir. 2006) (holding, as

alternative basis for affirming dismissal of RICO claims, that claimant lacked standing in light of

*Anza*).  Accordingly, BCI's RICO counterclaims will be dismissed.[21]


B. Breach of contract/duty of good faith

BCI also has brought a claim that Performax's actions in reducing the flow of new cases

sent to BCI, and in terminating BCI from some of its existing cases, constitute a breach of

contract and/or duty of good faith and fair dealing.  The court will dismiss this counterclaim as

well.

BCI has not and cannot allege that any written contract between itself and Performax

prohibits the latter's actions.  BCI accordingly claims that it has had a oral contract with

Performax, whereby BCI created a dedicated group of employees to work on Performax cases

and Performax promised to provide BCI with a "continuing flow of business, so that the

---

[20] As suggested above, it further concerns the court that Performax's actions would not even constitute attempted extortion unless BCI could show that the underlying scheme in which Performax was inviting BCI to participate was unlawful in the first place.

[21] Because the court will dismiss BCI's RICO claims on standing grounds, there is no need to assess the plaintiffs' alternative arguments for dismissal on the grounds that BCI has failed to allege sufficiently a RICO "pattern," an "enterprise," or sufficient predicate acts.

dedicated Performax group would not become idle or underemployed, and BCI's investment would not be wasted" (¶ 213).  The terms of such an agreement are too ambiguous and illusory to constitute an enforceable contract.  *See Kiley v. First Nat'l Bank of Md.*, 649 A.2d 1145, 1152 (Md. App. 1994) (under Maryland law "an enforceable contract must express with definiteness and certainty the nature and extent of the parties' obligations") (citing *Canaras v. Lift Truck Services*, 322 A.2d 866, 871 (Md. 1974)); *Fairfield Six/Hidden Valley P'ship v. Resolution Trust Co.*, 860 F.Supp. 1085, 1089 (D.Md. 1994).  BCI does not allege that the parties, even through a course of conduct, agreed to a minimum or target level of business, nor would such an agreement qualify as a "requirements" or "output" contract.[22]  *Cf. Lohman v. Wagner*, 862 A.2d 1042, 1049 (Md.App. 2004); Md. Code, Commercial Law, § 2-306.

Finally, no court has held that Maryland recognizes a separate cause of action for breach of duty of good faith and fair dealing.  *See Abt Assocs., Inc. v. Jhpiego Corp.*, 104 F.Supp.2d 523, 534 (D.Md. 2000), *aff'd*, 9 Fed. Appx. 172 (4th Cir. 2001) (citing *Parker v. The Columbia Bank*, 604 A.2d 521, 531 (Md. App. 1992)); *Howard Oaks, Inc. v. Maryland Nat'l Bank*, 810 F.Supp. 674, 677 (D.Md.1993).

---

[22] Although the court does not consider such extrinsic evidence on a motion to dismiss, it notes that, at a hearing, Katz agreed with the assertion that no contractual obligation prevents Performax from terminating BCI from its cases.  (Hr'g Tr. 140-42, Feb. 21, 2006.)

IV. <u>Conclusion</u>

Based on the above analysis, the court will grant the plaintiffs' motion to dismiss BCI's

counterclaims Seven, Eight, and Nine in full.  A separate Order follows.


<u>August 10, 2006</u>                                        _____/s/_____
Date                                                                  Catherine C. Blake
                                                                        United States District Judge

19